**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DEBRA GARIETY; HORST O. BISCHOFF,
as Trustee of Bischoff Family Trust;
PAMELA HANYZEWKI; JOHN J. CLINE;
THOMAS ALLEN, Individually and on
Behalf of all Others Similarly
Situated; THOMAS J. SHANNON, JR.,
as Trustee, Natural Parent and
Guardian of; SMV HOLDING
COMPANY, PLL; VINCENT PAUL;
CHARLES THORNTON, Individually and
as Trustee, SEP; FRED L. MILLNER;
WARREN H. HYDE; CARYL HYDE;
TEEN RESPONSE, INCORPORATED;
ELIZABETH B. SPONSELLER; MICHAEL
J. SPONSELLER; TERRY OVERHOLSER;            No. 03-1629
and LAWRENCE CORMAN, on behalf
of themselves and all others
similarly situated,
                    *Plaintiffs-Appellees,*

                    and

CRYSTAL N. SHANNON; CITY
NATIONAL BANK, a banking
corporation; COAST PARTNERS
FINANCIAL CORPORATION, formerly
known as Coast Partners Securities,
Incorporated, a California
Corporation,
                    *Plaintiffs,*

                    and

FEDERAL DEPOSIT INSURANCE
CORPORATION,
                    *Intervenor-Plaintiff,*

                    v.

GRANT THORNTON, LLP,
                    *Defendant-Appellant,*

                    and

HERMAN & CORMANY; MICHAEL
GRAHAM; BILLY JEAN CHERRY; TERRY
LEE CHURCH; ESTATE OF J. KNOX
MCCONNELL, Philip C. Petty,
Administrator; LOUIS J. PAIS;
MICHAEL F. GIBSON; ANDREW L.
RAGO; JULIAN G. BUDNICK; GARY
ELLIS; J&J CONSTRUCTION COMPANY;
HERMIE CHURCH; DIVERSIFIED CAPITAL
MARKETS; MICHAEL PATTERSON; E.E.
POWELL & COMPANY, INCORPORATED;
JOHN DOES 1-100; ROBERT WAGNER;
QUANTUM CAPITAL CORPORATION;
FERRIS, BAKER, WATTS,
INCORPORATED; SCOTT &
STRINGFELLOW; NANCY VORONO;
GUNNALLEN FINANCIAL INCORPORATED;
JACK INGOLD; REGIS SECURITIES
CORPORATION, a/k/a Quantum
Securities Corporation; NANCY
VARGO; TOM DOOLEY; GARVIN
TANKERSLEY; ELLEN TURPIN; LORA
MCKINNEY; MICHAEL PATTERSON,
INCORPORATED; KUTAK ROCK;
ALAN D. STRASSER, an individual;
MICHAEL D. LAMBERT, an individual;
VIDA HEADRICK; EVELYN HERRON;

JEANIE WIMMER; VIRGINIA BURKS;
DEBRA BAILEY; SUSAN DALTON;
ROBBIN WHITE; CONSTANCE EVANS,
                              *Defendants,*

            and

MELISSA QUIZENBEURY; HOG PEN
ENTERPRISES, INCORPORATED; JLT
ENTERPRISES; KEYSTONE HARDWARE;
C&H RANCH; MARBIL,
INCORPORATED; HC & TC TRUST;
DOLORES HUGHES; BILL PACK;
WENDY PACK; TAMMY FISHER; LARRY
FISHER; HERMAN FISHER; JUDY KAHL;
ANDREW T. RAPOFF; DONNA MARIE
RAPOFF; MICHAEL A. RAPOFF; DANNY
RAPOFF; NANCY E. KELANON; DAVID
RAPOFF; ANDREW J. RAPOFF; MICHAEL
J. CHERRY; ROSLYN A. CHERRY; LEAH
M. CHERRY; RACHEL L. CHERRY;
DANIEL T. HALSEY; SUNRISE
AUTOMOTIVE GROUP, INCORPORATED;
NANCY E. KELAHAN; TERRY L. ROSE,
            *Intervenors-Defendants,*

            and

H. LYNDEN GRAHAM, JR.,
                              *Trustee,*

            v.

ADVANTA MORTGAGE CORPORATION
USA; CELINK, INCORPORATED,
formerly known as Compu-link
Service, Incorporated,
*Third Party Defendants,*

and

HARGRAVE MILITARY ACADEMY, a
non-profit corporation; WAYNESBURG
COLLEGE, a non-profit corporation;
MICHAEL CHERRY; TIMMY CLINE;
VICKIE CLINE; THE OFFICE OF THE
COMPTROLLER OF THE CURRENCY;
FIRST COMMERCE OF AMERICA,
*Parties in Interest.*

UNITED BANK, INCORPORATED,
formerly known as United National
Bank; TERRY WITT; GREGORY WITT;
DAVID WITT; SCOTT WITT; GARY
WITT; DENNIS WITT,
*Movants.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
David A. Faber, Chief District Judge.
(CA-99-992-2; CA-99-1115-2; CA-00-81-1; CA-00-655-1;
CA-99-862-2; CA-02-344-1)

Argued: February 27, 2004

Decided: May 12, 2004

Before NIEMEYER and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed in part, vacated in part and remanded by published opinion. Judge Niemeyer wrote the opinion, in which Judge Shedd and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** Stanley Julius Parzen, MAYER, BROWN, ROWE & MAW, L.L.P., Chicago, Illinois, for Appellant. Sigmund S. Wissner-Gross, HELLER, HOROWITZ & FEIT, P.C., New York, New York, for Appellees. **ON BRIEF:** John H. Tinney, Kimberley R. Fields, THE TINNEY LAW FIRM, Charleston, West Virginia; James C. Schroeder, Daniel G. Hildebrand, MAYER, BROWN, ROWE & MAW, L.L.P., Chicago, Illinois; Mark W. Ryan, Andrew J. Morris, Craig Isenberg, MAYER, BROWN, ROWE & MAW, L.L.P., Washington, D.C., for Appellant. Joshua I. Barrett, DITRAPINO, BARRETT & DIPIERO, P.L.L.C., Charleston, West Virginia, for Appellees.

## OPINION

NIEMEYER, Circuit Judge:

Grant Thornton LLP, a national accounting firm, appeals the district court's interlocutory order certifying this action as a class action to adjudicate the plaintiffs' securities-fraud claims against Grant Thornton in connection with the 1999 demise of the First National Bank of Keystone in Keystone, West Virginia. Grant Thornton contends principally that the district court, in finding that the predominance requirement of Federal Rule of Civil Procedure 23(b)(3) was satisfied, erred in accepting at face value the plaintiffs' allegations that the reliance element of their fraud claims could be presumed under a "fraud-on-the-market" theory without determining whether the plaintiffs had any basis for making the allegations. The district court, concerned about making findings that would overlap with and therefore prejudice issues on the merits, concluded that the plaintiffs' assertions alone were "enough at the certification stage" to justify certifying a class action under Rule 23(b)(3).

As more fully discussed below, we conclude that the district court's reliance on mere assertions did not fulfill the requirements that the district court take a "close look" at relevant matters, conduct a "rigorous analysis," and make findings in determining whether the plaintiffs have demonstrated that the requirements of Rule 23(b)(3) have been satisfied. We conclude, however, that the district court did not abuse its discretion, as argued by Grant Thornton, in its appointment of two of the plaintiffs as lead class representatives. Accordingly, we affirm in part and vacate in part the district court's certification order, and we remand this case for further proceedings.

I

Until the early 1990s, the First National Bank of Keystone ("Keystone") was a relatively small community bank in McDowell County, West Virginia. In 1992, Keystone embarked on a growth strategy through which it became a niche lender focusing on subprime mortgage loans (i.e., loans extended to higher risk borrowers), and in late 1993, it began buying Federal Housing Authority home improvement loans, pooling them, and selling shares in them to investors — a process called loan securitization. To pursue its loan securitization business, Keystone entered into financing relationships with other banks, paying higher than normal interest rates. In 1997, Keystone began to securitize its own high loan-to-value loans made to highly leveraged borrowers with little or no collateral. During these years, Keystone made its highly risky securitization business its principal business. From 1992, when Keystone had assets of $107 million, to 1999, Keystone's business grew almost tenfold. In 1995, Keystone was reported to be one of the most profitable community banks in the nation, and by 1999, it reported assets of $1.1 billion. Keystone was listed No. 1 in *American Banker*'s June 1999 list of "the 75 most profitable large community banks," with a "whopping" 7.24% return on average assets in 1998.

From 1992 until 1999, the Office of the Comptroller of the Currency ("OCC") examined Keystone's books annually, but the examinations proved unsatisfactory to OCC because of mutual distrust and the bank's resistance to examiners' findings. The examinations repeatedly uncovered unsafe and unsound banking practices and regulatory violations, yet OCC enforcement actions proved largely inef-

fective. In May 1998, pursuant to an agreement with the OCC to hire an outside auditor, Keystone hired the accounting firm of Grant Thornton LLP. Grant Thornton issued an audit report on April 19, 1999 (the "Audit Report"), which revealed no problem in Keystone's statement of assets. The July 1999 edition of *Walker's Manual of Unlisted Stocks* included a one-page write-up of Keystone that identified Grant Thornton as Keystone's auditor and that reported summary figures taken from Grant Thornton's Audit Report. During the period that Grant Thornton was Keystone's accountant, Grant Thornton also participated to some extent in the preparation of Keystone's "Call Reports," which Keystone filed quarterly with the Federal Deposit Insurance Corporation ("FDIC"). These Call Reports were available to the public on the FDIC website.

While OCC's examinations of Keystone generally focused on the credit risk associated with subprime mortgage loan securitizations, it was not until August 1999 that OCC independently verified that Keystone was unable to substantiate $515 million in loan assets, constituting almost one-half of its assets. On September 1, 1999, the OCC announced that Keystone was insolvent, and it closed the bank. A few months later, the FDIC's Bank Insurance Fund determined that the Keystone failure would cost the Fund between $750 and $850 million, making the loss one of the largest in history. A subsequent investigation by the Office of Inspector General determined that Keystone had been suffering heavy losses early in its growth period and that by late 1996 Keystone had become insolvent. Keystone concealed its financial condition by continuing to record loans as assets even after they had been sold to investors as part of a securitized loan pool. The Office of Inspector General concluded that "[a]lleged fraudulent accounting practices, uncooperative bank management and reported high profitability may have all served to mask the bank's true financial condition from OCC examiners."

The plaintiffs, who were purchasers of Keystone stock during the period after Grant Thornton issued its Audit Report on April 19, 1999, and before the OCC closed the bank on September 1, 1999, commenced this action to recover damages suffered by reason of the bank's failure. The plaintiffs proposed to represent a class of all purchasers of Keystone stock during the April-to-September period. Their amended complaint, which alleged four counts of federal secur-

ities fraud and seven counts of fraud under state law, named as defendants Grant Thornton, other accountants, former Keystone directors and officers, broker-dealers, and other Keystone stockholders who allegedly dumped Keystone stock based on inside information.

Plaintiffs settled their claims with a number of the defendants, including Keystone's former auditors, Keystone's outside directors, and certain of the broker defendants. To implement the settlement agreement, the district court certified a class and, after a final fairness hearing conducted on June 23, 2003, approved the class settlement as to the settling defendants. No one objected to the settlement, and it has now become final. Grant Thornton, however, was not a party to the settlement and has continued to defend this action.

In the complaint's counts against Grant Thornton, the plaintiffs alleged violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, as well as five state common-law counts for fraud, constructive fraud, negligent misrepresentation, aiding and abetting tortious conduct, and civil conspiracy. The plaintiffs alleged that Grant Thornton "participated in falsifying certain material financial information regarding Keystone" and issued the Audit Report "knowing that at least $515 million of Keystone's assets . . . did not exist, or at a minimum, recklessly representing that such assets did exist." They also alleged that Keystone insiders illegally dumped Keystone stock at inflated prices with the participation of certain stockbrokers who, when pitching Keystone, relied on, and in some cases provided class members with, the Audit Report, the write-up in *Walker's Manual*, the Call Reports, and the *American Banker* ratings. The plaintiffs purport to represent a class consisting of 150 or more persons who purchased stock between April 19, 1999 (the date of the Audit Report) and September 1, 1999 (the date when the OCC closed Keystone). During the class period, these class members engaged in approximately 244 trades of Keystone stock involving, in the aggregate, 130,500 shares.

In their motion to certify the action as a class action under Federal Rule of Civil Procedure 23(b)(3), the plaintiffs recognized that the element of reliance in their fraud claims "may require individualized determinations." To satisfy commonality and the predominance of common issues, however, they relied on a "presumption of reliance"

that can be made under a "fraud-on-the-market theory" when shares are purchased in an efficient market. Pointing to the allegations of their complaint, they maintained that they "adequately alleged that the market for Keystone stock did in fact exhibit the five hallmarks of an efficient market," as necessary for a fraud-on-the-market theory. Consequently, they claimed that they were entitled to a presumption of reliance, which would permit the district court to find fulfilled the requirement of Rule 23(b)(3) that common issues predominate over issues involving only individual class members.

By an order dated March 28, 2003, the district court ruled that plaintiffs could maintain this action as a class action under Rule 23(b)(3), and it appointed Horst Bischoff and Debra Gariety as lead representative plaintiffs. In its order, the court acknowledged that "plaintiffs were in fact exposed to differing combinations of omissions and misrepresentations, including some oral, making individual reliance a live issue." To conclude that common issues predominated over individualized ones, as required by Rule 23(b)(3), the court relied on a presumption of reliance based on a fraud-on-the-market theory, which requires that the plaintiffs have purchased in an efficient market for Keystone stock. In response to Grant Thornton's argument that the plaintiffs were not entitled to the presumption because Keystone stock was not in fact traded on an efficient market, the court stated:

> This court declines to make a detailed examination here of the efficiency of the market in which Keystone shares were traded because it would require the court to make judgments and conclusions regarding the extent and nature of the fraud alleged by the plaintiffs. Such determinations, in the absence of the procedural safeguards available at trial or the legal standard of sufficiency for summary judgment, could theoretically prejudice a party. . . . The court finds the fact that the plaintiffs have asserted that the Keystone market was efficient is enough at the certification stage to find the market efficient.

In response to Grant Thornton's additional argument that Rule 23(b)(3) could not be satisfied because plaintiffs' claims involved the application of laws from several different States, the district court

acknowledged that the laws of at least six States would apply but concluded, with little further explanation, that the variation in those laws was "minimal."

Pursuant to Federal Rule of Civil Procedure 23(f), Grant Thornton requested permission to appeal the district court's interlocutory certification order, and on May 23, 2003, we granted that request. This appeal followed.

II

The underlying principles for certifying a class action are not controverted. A district court may, in its discretion, order that an action proceed as a class action only if it finds that the requirements of Federal Rule of Civil Procedure 23 have been satisfied. Every class action must satisfy the four requirements of Rule 23(a) — numerosity, typicality, commonality, and adequacy of representation, with "the final three requirements . . . 'tend[ing] to merge.'" *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998) (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157, n.13 (1982)). In addition, a proposed class must also satisfy the requirements of one of the three Rule 23(b) categories. In this case, the plaintiffs requested certification of the class under Rule 23(b)(3), which requires the court to find (1) that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" (the predominance requirement), and (2) that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy" (the superiority requirement). Rule 23(b)(3)'s predominance requirement is "far more demanding" than Rule 23(a)'s commonality requirement and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). The plaintiffs who propose to represent the class bear the burden of demonstrating that the requirements of Rule 23 are satisfied. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001).

The claims on which the plaintiffs seek to proceed against Grant Thornton as representatives of a class are essentially securities-fraud claims under federal and state law. To prove a violation of the federal

antifraud provisions of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, "a plaintiff must prove that, in connection with the purchase or sale of a security, (1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999) (internal quotation marks and citations omitted). The parties agree that the requirements for state common law fraud and negligent misrepresentation have analogous elements. Because proof of reliance is generally individualized to each plaintiff allegedly defrauded, *see Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 434-35 (4th Cir. 2003), fraud and negligent misrepresentation claims are not readily susceptible to class action treatment, precluding certification of such actions as a class action. *See id.*; *Broussard*, 155 F.3d at 341; *Andrews v. AT&T Co.*, 95 F.3d 1014, 1025 (11th Cir. 1996) (decertifying class in part because "the plaintiffs would . . . have to show, on an individual basis, that they relied on the misrepresentations, suffered injury as a result, and incurred a demonstrable amount of damages"); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) (concluding that "a fraud class action cannot be certified when individual reliance will be an issue"). As the Supreme Court explained in *Basic, Inc. v. Levinson*, 485 U.S. 224, 242 (1988), "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented [plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones." Both the plaintiffs and the district court recognized the barriers to certifying a class action where proof of individualized reliance would have to be proved because such individual issues would then likely "overwhelm" the common ones and preclude the court from finding satisfaction of the predominance requirement of Rule 23(b)(3).

Reliance can, however, be treated as a common issue if it is *presumed* under the theory that the defendants defrauded the market — not the individual plaintiffs — so long as the plaintiffs purchased their stock in an efficient market. The "fraud-on-the-market" theory was recognized by the Supreme Court in *Basic* as a way to litigate securities-fraud class actions.

In *Basic*, the Court acknowledged that Rule 10b-5 actions include a reliance element and recognized that proof of individualized reliance from each class member "effectively would have prevented" the plaintiff from proceeding with a class action, given the commonality and predominance requirements of Rules 23(a)(2) and 23(b)(3). 485 U.S. at 242. But the Court held that this barrier could be overcome with a rebuttable presumption of reliance that may be applied through a fraud-on-the-market theory. *Id.* at 241-49. Quoting the Third Circuit, *Basic* described the theory as follows:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in the case of direct reliance on misrepresentations."

*Id.* at 241-42 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)). The *Basic* Court emphasized the difference between "modern securities markets, literally involving millions of shares changing hands daily, [and] the face-to-face transactions contemplated by early fraud cases. . . ." *Id.* at 243-44. With face-to-face transactions, the reliance inquiry focuses on the "subjective pricing" of information before an investor. *Id.* at 244. In a modern securities market, by contrast,

> "the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price."

*Id.* (quoting *In re LTV Sec. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980)). Persuaded that "the market price of shares traded on well-

developed markets reflects all publicly available information, and, hence, any material misrepresentations," the Court concluded that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Id.* at 246-47. The Court held that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *Id.* at 247.

Application of the reliance presumption is not, however, automatic in all federal securities-fraud actions. To gain the benefit of the presumption, a plaintiff must prove "(1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market"; and (4) that the plaintiff purchased the shares after the misrepresentations but before the truth was revealed. *Basic*, 485 U.S. at 248 n.27 (citing *Levinson v. Basic, Inc.*, 786 F.2d 741, 750 (6th Cir. 1986)).

In this case, Grant Thornton contends that the fraud-on-the-market theory cannot be applied to create the reliance presumption because (1) Keystone's shares were not traded on an efficient market, and (2) Grant Thornton did not make any public misrepresentations — i.e., misrepresentations on which the *market* could rely. It therefore contends that as a matter of law, the district court erred in applying the fraud-on-the-market presumption of reliance. Without that presumption, the plaintiffs must prove individualized reliance and therefore almost certainly cannot meet the requirement of 23(b) that common questions predominate over questions affecting only individual members. Grant Thornton also contends that the district court erred by "refusing to look beyond the pleadings" in determining that the fraud-on-the-market presumption of reliance applied in this case.

In its certification order, the district court recognized that "the predominance requirement can be a sticking point in securities class action certifications where fraud is alleged because individual issues of reliance on fraudulent misrepresentations may be such as to undercut a showing of predominance." Indeed, the court observed that in this case "plaintiffs were in fact exposed to differing combinations of omissions and misrepresentations, including some oral, making individual reliance a live issue." To overcome this barrier to finding pre-

dominance under Rule 23(b)(3), the district court applied a presumption of reliance through the fraud-on-the-market theory. In determining whether the conditions for application of this theory were satisfied, the court examined the plaintiffs' complaint and concluded that the complaint had adequately alleged the elements of a fraud-on-the-market theory, thereby justifying the creation of a presumption of reliance. Explaining its refusal to look beyond the complaint, the court stated that it was "declin[ing] to make a detailed examination here of the efficiency of the market in which Keystone shares were traded because it would require the court to make judgments and conclusions regarding the extent and nature of the fraud alleged by the plaintiffs." Citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974), for the proposition that "no inquiry into the merits of a case can be held at the certification stage," the district court simply relied on Keystone's allegations in the complaint and based on those allegations found that

> the fact that the plaintiffs have asserted that the Keystone market was efficient is enough at the certification stage to find the market efficient. . . . The plaintiffs further assert that they all purchased Keystone stock during the period when the fraud they allege was perpetrated on the market. Accordingly, the plaintiffs have demonstrated to the satisfaction of the court that they are entitled to a presumption of reliance for their fraud claims under the Securities [ ] Exchange Act.*

---

*While the court stated it was declining to make any detailed examination of the efficiency of the market in this case, it also stated that "had it chosen to make an investigation into the efficiency of the market in question, there [was] evidence in this case that could support a finding of market efficiency," citing to the single fact that the shares dropped in value over the period of a couple of days after the OCC announced that it had closed the bank. Had the court conducted an inquiry into the facts presented about the market for Keystone stock, however, it would have been confronted with at least a serious question about whether plaintiffs in this case could demonstrate that they purchased their shares on a market sufficiently efficient to act as a surrogate for reliance. Prior to June 25, 1999, Keystone stock was unlisted, and thereafter it was listed only in the "Pink Sheets" and the Nasdaq OTC Bulletin Board. Moreover, dur-

We conclude that, by accepting the plaintiffs' allegations for purposes of certifying a class in this case, the district court failed to comply adequately with the procedural requirements of Rule 23. Rule 23(b)(3) on its face requires the court to "*find*[ ] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members. . . ." (Emphasis added). In addition, the Rule lists numerous factors for the court to consider in making its "findings." If it were appropriate for a court simply to accept the allegations of a complaint at face value in making class action findings, every complaint asserting the requirements of Rule 23(a) and (b) would automatically lead to a certification order, frustrating the district court's responsibilities for taking a "close look" at relevant matters, *Amchem*, 521 U.S. at 615, for conducting a "rigorous analysis" of such matters, *Falcon*, 457 U.S. at 161, and for making "findings" that the requirements of Rule 23 have been satisfied, *see* Fed. R. Civ. P. 23(b)(3). Moreover, if courts could only consider the pleadings, then "parties would have wide latitude to inject frivolous issues to bolster or undermine a finding of predominance." Robert G. Bone & David S. Evans, *Class Certification and the Substantive Merits*, 51 Duke L.J. 1251, 1269 (2002).

When Rule 23(c), which originally required certification orders to be made "as soon as practicable after commencement of [the] action," was amended in 2003 to require the court to determine class certifications "at an early practicable time," the Advisory Committee on Civil Rules explained the preexisting and longstanding practice that prompted the change:

> Time may be needed to gather information necessary to make the certification decision. Although an evaluation of

---

ing the entire class period, there were only 244 trades, with an average of 2.5 trades a day. More importantly, during the relevant trading period, there were days on which the spread between the bid and the ask price was nearly 30%. While that volatility was not constant, it existed in varying degrees at various times during the period of relevant trading. If the district court were to take such facts into account, it would have been faced with formidable evidence that the generally accepted criteria for an efficient market might not have been satisfied during the period from April to September 1999.

> the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. *In this sense, it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis.*

Fed. R. Civ. P. 23 advisory committee's note to 2003 amendments (emphasis added).

The *Eisen* decision, upon which the district court relied, does not require a court to accept plaintiffs' pleadings when assessing whether a class should be certified. In *Eisen*, the Supreme Court held that the district court's preliminary hearing *on the merits of the case* — concluding that the plaintiff was "more than likely" to prevail — was inappropriate for the purpose of determining whether a class action could be maintained. 417 U.S. at 177-78. *Eisen* simply restricts a court from expanding the Rule 23 certification analysis to include consideration of whether the proposed class is likely to prevail ultimately on the merits. *See Castano*, 84 F.3d at 744; 5 *Moore's Federal Practice* ¶ 23.84[2] [a] (3d ed. 2003). As the Supreme Court itself stated in a post-*Eisen* case, "sometimes it may be necessary for the [district] court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160; *see also Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action" (internal quotation marks omitted)).

Thus, while an evaluation of the merits to determine the strength of plaintiffs' case is not part of a Rule 23 analysis, the factors spelled out in Rule 23 must be addressed through findings, even if they overlap with issues on the merits. *Eisen*'s prohibition against assessing plaintiffs' likelihood of success on the merits as part of a Rule 23 certification does not mean that consideration of facts necessary to a Rule 23 determination is foreclosed merely because they are required to be proved as part of the merits. The analysis under Rule 23 must focus on the requirements of the rule, and if findings made in connection with those requirements overlap findings that will have to be

made on the merits, such overlap is only coincidental. The findings made for resolving a class action certification motion serve the court *only* in its determination of whether the requirements of Rule 23 have been demonstrated.

The district court's concern that Rule 23 findings might prejudice later process on the merits need not lead to the conclusion that such findings cannot be made. The jury or factfinder can be given free hand to find all of the facts required to render a verdict on the merits, and if its finding on any fact differs from a finding made in connection with class action certification, the ultimate factfinder's finding on the merits will govern the judgment. A model for this process can be observed in the context of the preliminary injunction practice. Courts make factual findings in determining whether a preliminary injunction should issue, but those findings do not bind the jury adjudging the merits, and the jury's findings on the merits govern the judgment to be entered in the case. *See, e.g.*, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

At bottom, we agree with the conclusion reached by the Seventh Circuit when it observed:

> The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it. . . . Before deciding whether to allow a case to proceed as a class action . . . a judge should make whatever factual and legal inquiries are necessary under Rule 23. . . . And if some of the considerations under Rule 23(b)(3) . . . overlap the merits . . . then the judge must make a preliminary inquiry into the merits.

*Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001).

We must not lose sight of the fact that when a district court considers whether to certify a class action, it performs the public function of determining whether the representative parties should be allowed to prosecute the claims of absent class members. Were the court to defer to the representative parties on this responsibility by merely

accepting their assertions, the court would be defaulting on the important responsibility conferred on the courts by Rule 23 of carefully determining the class action issues and supervising the conduct of any class action certified.

Because the district court concededly failed to look beyond the pleadings and conduct a rigorous analysis of whether Keystone's shares traded in an efficient market, we must remand the case to permit the district court to conduct the analysis and make the findings required by Rule 23(b)(3).

## III

When the district court indicated that it was relying only on the plaintiffs' assertions to determine whether the predominance requirement had been satisfied, the court also said that "had it chosen to make an investigation into [the] efficiency of the market in question," it would have found evidence to support a finding of market efficiency, citing the drop in price of Keystone shares during the days *after* the OCC closed the bank. Not only does this hypothetical finding fail to comport with the rigorous analysis required when determining whether a case may proceed as a class action, but it also overlooks the substantive requirements that a plaintiff must satisfy to sustain the fraud-on-the-market theory.

The fraud-on-the-market theory was recognized as a surrogate for individualized reliance, creating a presumption of reliance, based on the proposition that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Basic*, 485 U.S. at 247. The fraud-on-the-market theory "interpret[s] the reliance requirement to mean reliance on the integrity of the market price rather than reliance on the challenged disclosure." Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory*, 74 Cornell L. Rev. 907, 908 (1989). In contrast to face-to-face transactions, where an investor has no reason to rely on the integrity of an offered price because the price may not reflect available information, "[t]he central premise of the fraud on the market theory is that prices of actively traded securities reflect publicly available information." *Id.* at 911; *see also Basic*, 485 U.S. at 243-44 (quoting *In re LTV Sec. Litig.*, 88 F.R.D. at 143) (contrasting face-to-

face transactions with modern securities markets). For face-to-face transactions, the reliance requirement serves

> to ensure that the plaintiffs who would not have acted differently if the true information were known cannot recover. The requirement guarantees, in other words, that information that does not affect a buyer's or seller's view of the merits of a transaction cannot form the basis of a cause of action. In organized markets, however, the market has already performed the function of distinguishing between unimportant and important information.

Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 Bus. Law. 1 (1982). A reasonable investor will rely on the integrity of the market price, however, only if the market is efficient, because in an efficient market, "the market price has integrity[;] . . . it adjusts rapidly to reflect all new information." Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory*, 42 Stan. L. Rev. 1059, 1060 (1990). Only in those circumstances, therefore, may a court presume reliance and avoid individualized inquiries.

Although *Basic* clearly requires that a market be efficient in order for the fraud-on-the-market presumption of reliance to be invoked, 485 U.S. at 248 n.27, the decision offers little guidance for determining whether a market is efficient. The Court does refer to "modern securities markets, literally involving millions of shares changing hands daily," *id.* at 243, but that is obviously a general statement offered as a contrast to face-to-face transactions and is not meant as a necessary requirement for finding that a market is efficient. Of more relevance, but only of limited guidance, are the Court's references to an "open and developed" market and an "impersonal, well-developed market." *See id.* at 241, 247.

Nonetheless, it is recognized that it is "[r]ivalrous competition among market professionals [that] drives securities prices to their efficient levels." *Macey & Miller*, *supra*, at 1086; *see also West v. Prudential Sec., Inc.*, 282 F.3d 935, 937 (7th Cir. 2002) ("The theme of *Basic* and other fraud-on-the-market decisions is that *public* informa-

tion reaches professional investors, whose evaluations of that information and trades quickly influence securities prices"); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1129 (7th Cir. 1993) ("Competition among savvy investors leads to a price that impounds all available information, even knowledge that is difficult to articulate. We call a market 'efficient' because the price reflects a consensus about the value of the security being traded . . ."). Thus, "[t]he more thinly traded the stock, the less well the price reflects the latest pieces of information." *Eckstein*, 8 F.3d at 1130.

As a consequence, to determine whether a security trades on an efficient market, a court should consider factors such as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals. *See, e.g.*, *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D. N.J. 1989) (examining (1) average trading volume, (2) number of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if relevant, and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes).

While the district court's brief allusion to the drop in the price of Keystone's shares during the days after the OCC announced that Keystone was insolvent reflects the assimilation of market information at its grossest level, that single piece of information, standing alone, does not represent adequate evidence that the plaintiffs in this case purchased their shares of Keystone stock in an efficient market. But this is not to say that there is no other evidence for the court to consider. There is. Substantial discovery has taken place since the district court issued its certification order, and on remand, the court is free to consider matters developed through this discovery, as well as other matters it considers appropriate for making its Rule 23 findings.

IV

Also in connection with the issue of whether the district court conducted a sufficiently rigorous analysis of the predominance requirement of Rule 23(b)(3), Grant Thornton contends (1) that the district court did not adequately determine whether Grant Thornton made public misrepresentations as required to show fraud-on-the-market,

and (2) that the district court did not adequately review the state law that would be applied to resolve the state-law claims, nor did it determine whether application of those laws would preclude a finding that the predominance requirement has been satisfied. We address these two points *seriatim*.

A

Grant Thornton properly notes that in order to rely on presumed reliance flowing from an application of the fraud-on-the-market theory, the plaintiffs must demonstrate, among other things, that the defendant made a public misrepresentation. *See Basic*, 485 U.S. at 248 n.27. It also notes that such a misrepresentation must be directly attributable to Grant Thornton and not to some other person, because liability under § 10(b) of the Securities Exchange Act and Rule 10b-5 does not include aiding and abetting liability. *See Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994). In *Central Bank*, the Supreme Court observed that aiding and abetting liability would, if recognized, permit plaintiffs to "circumvent the reliance requirement" because a "defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions." *Id.* at 180; *see also Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996) ("The critical element separating primary from aiding and abetting violations is the existence of a representation, either by statement or omission, made by the defendant, that is relied upon by the plaintiff").

In this case, the plaintiffs contend that Grant Thornton can be held liable for public misrepresentations from (1) the contents of its Audit Report; (2) its alleged substantial participation in the preparation of Keystone's Call Reports filed with the FDIC; and (3) "the verbatim recitation of financial information contained in the Audit Report included in *Walker's Manual*." Grant Thornton argues that it could not be so liable because the Audit Report was not publicly filed and Grant Thornton was not the author, nor credited as the author, of the FDIC Call Reports or the summary contained in *Walker's Manual*.

In addressing this issue and reaching the conclusion that the plaintiffs fulfilled the requirement in this respect for satisfying the fraud-on-the-market theory, the district court again relied on mere allega-

tions made by the plaintiffs that Grant Thornton "actively falsified Call Reports sent to the FDIC," that "the falsified reports influenced public opinion about Keystone," and that *Walker's Manual* contained a summary of the Audit Report. Because the district court must, on remand, make a finding of whether common issues predominate over individual issues in the context of reliance and the application of fraud-on-the-market theory, it should also address more completely whether Grant Thornton made a public misrepresentation for which it may be found primarily liable. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) ("[A] secondary actor cannot incur primary liability under the [Securities Exchange] Act for a statement not attributed to that actor at the time of its dissemination"); *Anixter*, 77 F.3d at 1226 ("[F]or an accountant's misrepresentation to be actionable as a primary violation, . . . [he] must [himself] make a false or misleading statement (or omission) that [he] know[s] or should know will reach potential investors"). *But see In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615, 628 n.3 (9th Cir. 1994) (acknowledging *Central Bank* and holding that a secondary actor can be primarily liable under § 10(b) if the actor "played a significant role" in the preparation of fraudulent statements).

B

Apart from the fraud-on-the-market theory, Grant Thornton contends that because the law of several States will have to be applied to resolve state law claims, such individual determinations would preclude a finding of predominance under Rule 23(b)(3).

The district court allowed that the laws of at least six States are applicable, and the plaintiffs do not dispute Grant Thornton's characterization of these laws as including a reliance requirement. Moreover, as Grant Thornton points out, the laws of the six States identified relate only to the 16 representative parties and not to the absent class members. The proposed class includes 150 or more persons, and with respect to the absent class members, the applicable state law has not yet been identified. The plaintiffs have the burden of showing that common questions of law predominate, and they cannot meet this burden when the various laws have not been identified and compared. Moreover, with the potential for individualized reliance determinations having to be made under the law of at least six

different States, the district court did not explain why it could find the predominance requirement satisfied. At least four of the States identified so far have declined to adopt the fraud-on-the-market presumption of reliance to substitute for finding individualized reliance. *See In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 968 (D. Md. 1995); *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1200-01 (N.J. 2000); *Akerman v. Price Waterhouse*, 683 N.Y.S.2d 179, 192 (App. Div. 1998); *Kahler v. E. F. Hutton*, 558 So.2d 144, 145 (Fla. Dist. Ct. App. 1990). And, as we have indicated, individual inquiries into reliance typically preclude a finding that common issues of fact predominate. *See Gunnells*, 348 F.3d at 434-35; *Broussard*, 155 F.3d at 341; *see also Castano*, 84 F.3d at 745 (going so far as to hold that "a fraud class action cannot be certified when individual reliance will be an issue").

Because the plaintiffs bear the burden in this regard of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden, we also commend this issue to the district court for further development on remand.

V

Finally, Grant Thornton contends that the district court abused its discretion in appointing Horst Bischoff and Debra Gariety as lead class representatives under Rule 23(a)(4). With respect to Bischoff, Grant Thornton contends that he is "incapable of directing this litigation" because "he testified repeatedly [in his deposition] that any knowledge that he had about this case was acquired solely from his attorneys, and that his lawyers make the decisions in this case." As to Gariety, Grant Thornton argues that because the court denied her motion to be lead plaintiff pursuant to the Private Litigation Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 77z-1(a)(3)(B)(i), she should not be allowed to serve as a lead class representative under Rule 23(a)(4).

The district court found that "whatever challenges Mr. Bischoff may face as a class representative," he "has demonstrated that he is adequately involved in the litigation by reading pleadings and conferring with Ms. Gariety and his counsel regarding strategy." We con-

clude that the district court did not abuse its discretion in making this finding.

With respect to allowing Gariety to be a representative party even though she was denied the role as the lead plaintiff pursuant to the PSLRA, we again conclude that the district court did not abuse its discretion. Pursuant to the PSLRA, the court simply determined which plaintiff was the "*most* capable of adequately representing the interests of class members." *See id.* (emphasis added). The district court "felt that Bischoff was simply a better lead plaintiff" and "did not find that Gariety . . . was a *per se* inadequate lead plaintiff." In reaching this conclusion under the PSLRA, the district court did not preclude a subsequent ruling that Gariety could serve as a lead class representative under Rule 23(a)(4), and its decision in this regard has not been shown to constitute an abuse of discretion.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*