**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 06-2248**

---

DEBRA GARIETY; HORST O. BISCHOFF, as Trustee
of Bischoff Family Trust; PAMELA HANYZEWKI;
JOHN J. CLINE; THOMAS ALLEN, Individually and
on behalf of all others similarly situated;
THOMAS J. SHANNON, JR., as Trustee, Natural
Parent and Guardian of Crystal N. Shannon; SMV
HOLDING COMPANY, PLL; VINCENT PAUL; CHARLES
THORNTON, Individually and as Trustee, SEP;
FRED L. MILLNER; WARREN H. HYDE; CARYL HYDE;
TEEN RESPONSE, INCORPORATED; ELIZABETH B.
SPONSELLER; MICHAEL J. SPONSELLER; TERRY
OVERHOLSER; LAWRENCE CORMAN, on behalf of
themselves and all others similarly situated,

Plaintiffs - Appellants,

versus

NANCY VORONO; VIDA HEADRICK; EVELYN HERRON;
JEANIE WIMMER,

Defendants - Appellees,

and

GRANT THORNTON, LLP; HERMAN & CORMANY; MICHAEL
GRAHAM; BILLY JEAN CHERRY; TERRY LEE CHURCH;
ESTATE OF J. KNOX MCCONNELL; LOUIS J. PAIS;
MICHAEL F. GIBSON; ANDREW L. RAGO; JULIAN G.
BUDNICK; GARY ELLIS; J&J CONSTRUCTION COMPANY;
HERMIE CHURCH; DIVERSIFIED CAPITAL MARKETS;
MICHAEL PATTERSON, a/k/a MPI Financial; MICHAEL
PATTERSON, INCORPORATED; E.E. POWELL & COMPANY,
INCORPORATED; JOHN DOES 1-100; ROBERT WAGNER;
QUANTUM CAPITAL CORPORATION; FERRIS, BAKER,
WATTS, INCORPORATED; SCOTT & STRINGFELLOW;
GUNNALLEN FINANCIAL INCORPORATED; JACK INGOLD;
REGIS SECURITIES CORPORATION; NANCY VARGO; TOM

DOOLEY; GARVIN TANKERSLEY; ELLEN TURPIN; LORA MCKINNEY; PHILIP C. PETTY, Administrator; VICKIE MIKLES; DONNA DICKERSON; MARY A. WHITE; VIRGINIA BURKS; CONSTANCE EVANS; RITA LASSAK; DEBRA BAILEY; SUSAN DALTON; ROBBIN WHITE; TAMMY FISHER; CITY NATIONAL BANK; UNITED NATIONAL BANK,

Defendants,

HARGRAVE MILITARY ACADEMY, a non-profit corporation; WAYNESBURG COLLEGE, a non-profit corporation; MICHAEL CHERRY; TIMMY CLINE; VICKIE CLINE; THE OFFICE OF THE COMPTROLLER OF THE CURRENCY; FIRST COMMERCE OF AMERICA,

Parties in Interest,

MELISSA QUIZENBEURY; HOG PEN ENTERPRISES, INCORPORATED; JLT ENTERPRISES; KEYSTONE HARDWARE; C&H RANCH; MARBIL,INCORPORATED; HC & TC TRUST; DOLORES HUGHES; BILL PACK; WENDY PACK; TAMMY FISHER; LARRY FISHER; HERMAN FISHER; JUDY KAHL; ANDREW T. RAPOFF; DONNA MARIE RAPOFF; MICHAEL A. RAPOFF; DANNY RAPOFF; NANCY E. KELANON; DAVID RAPOFF; ANDREW J. RAPOFF; MICHAEL J. CHERRY; ROSLYN A. CHERRY; LEAH M. CHERRY; RACHEL L. CHERRY; DANIEL T. HALSEY; SUNRISE AUTOMOTIVE GROUP, INCORPORATED; NANCY E. KELAHAN; TERRY L. ROSE,

Intervenors/Defendants,

H. LYNDEN GRAHAM, JR.,

Trustee,

versus

ADVANTA MORTGAGE CORPORATION USA; CELINK, INCORPORATED, formerly known as Compu-link Service, Incorporated,

Third Party Defendants.

2

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  David A. Faber, Chief District Judge.  (2:99-00992)

Argued: October 31, 2007                    Decided: January 8, 2008

Before WILLIAMS, Chief Judge, and NIEMEYER and SHEDD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Joshua Israel Barrett, DITRAPANO, BARRETT & DIPIERO, Charleston, West Virginia, for Appellants.  David Dale Johnson, III, WINTER, JOHNSON & HILL, P.L.L.C., Charleston, West Virginia; William Bernard Flanigan, SANDERS, AUSTIN, PRUDICH, FLANIGAN & ABOULHOSN, Princeton, West Virginia; Shawn Patrick George, GEORGE & LORENSEN, P.L.L.C., Charleston, West Virginia, for Appellees.  **ON BRIEF:** Sigmund S. Wissner-Gross, BROWN & RUDNICK, New York, New York; Rudolph L. DiTrapano, Sean P. McGinley, DITRAPANO, BARRETT & DIPIERO, Charleston, West Virginia, for Appellants.  Larry A. Winter, WINTER, JOHNSON & HILL, P.L.L.C., Charleston, West Virginia, for Appellee Nancy Vorono.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal marks at least the fifth occasion we have addressed the repercussions of the 1999 collapse of First National Bank of Keystone, in Keystone, West Virginia ("Keystone"). See F.D.I.C. v. Bakkebo, -- F.3d --, 05-2175 Slip Op. (4th Cir. October 25, 2007) (civil action brought by FDIC); Gariety v. Grant Thornton, LLP, 368 F.3d 356 (4th Cir. 2004) ("Gariety I")(class action by persons who purchased stock prior to Keystone's failure); United States v. Cherry, 330 F.3d 658 (4th Cir. 2003) (criminal appeal); United States v. Church, 11 Fed. App'x. 264 (4th Cir. 2001) (unpublished) (same). The current action, styled "Gariety II," is a lawsuit filed by individuals (the "Plaintiffs") who purchased Keystone stock between September 28, 1998 and September 1, 1999, when Keystone was declared insolvent and closed by federal regulators.

The Plaintiffs filed a three-count complaint on April 15, 2002 in the United States District Court for the Southern District of West Virginia on the basis of diversity jurisdiction, 28 U.S.C.A. § 1332 (West 2006), and named more than twenty defendants, including the following persons: Nancy Vorono, identified as the long-time secretary of Keystone's President, J. Knox McConnell; Vida Headrick, a close personal friend of Billy Cherry (one of the principal criminal conspirators); Evelyn Herron, a bank manager of Keystone's Bradshaw, West Virginia branch; and Jeanie Wimmer, a

4

teller at the Bradshaw branch. On appeal, our inquiry centers only on Count One of the Plaintiffs' complaint, which alleged a claim for unjust enrichment. Specifically, Count One alleged that the defendants "obtained the proceeds of the sales of their [Keystone] stocks by fraud," or, "that [if] any of the Defendants obtained the proceeds of the sale of their Keystone stock without fraud, it is against equity for any such Defendant to be permitted to continue to hold such proceeds." (J.A. at 418.)

The district court, following discovery, granted summary judgment in favor of Vorono, Headrick, Herron, and Wimmer, concluding that the Plaintiffs had put forth insufficient evidence that the four women obtained any property by way of wrongdoing.[1] Pursuant to Federal Rule of Civil Procedure 54(b), the district court then entered an order of final judgment as to the unjust enrichment claim against the four women. The Plaintiffs have appealed, and we possess jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).

---

[1]In contrast, the district court did grant the Plaintiffs' motion for summary judgment as to several other defendants, including Billy Cherry, Melissa Quizenbeury, Ellen Turpin, and Lora McKinney. Those defendants have not appealed that ruling. The district court also calendared for trial unjust enrichment claims against four other Keystone employees, Constance Evans, Virginia Burkes, Susan Delton, and Deborah Bailey.

I.

Until the early 1990s, Keystone was a community bank in the small town of Keystone, West Virginia (population less than 1,000) with assets of around $17 million. The town of Keystone itself "looks like a movie set left over from Coal Miner's Daughter." Timothy Roche, Poor Town, Rich Bank, Time Magazine, November 1, 1999. At that time McConnell, a Pittsburgh area banker who had taken control of the bank in 1977, embarked upon a growth strategy based upon acquiring subprime mortgage loans and Federal Housing Authority home improvement loans. On paper, this growth strategy was highly successful. In Gariety I we explained:

> To pursue its loan securitization business, Keystone entered into financing relationships with other banks, paying higher than normal interest rates. In 1997, Keystone began to securitize its own high loan-to-value loans made to highly leveraged borrowers with little or no collateral. During these years, Keystone made its highly risky securitization business its principal business. From 1992, when Keystone had assets of $107 million, to 1999, Keystone's business grew almost tenfold. In 1995, Keystone was reported to be one of the most profitable community banks in the nation, and by 1999, it reported assets of $1.1 billion. Keystone was listed No. 1 in American Banker's June 1999 list of "the 75 most profitable large community banks," with a "whopping" 7.24% return on average assets in 1998.

368 F.3d at 359.

During this time frame, however, Keystone was under near-constant investigation from the Office of the Comptroller of the Currency ("OCC") for possible reporting violations and falsification of bank records.

6

In October 1997, McConnell passed away unexpectedly. Under his then-existing will, a large portion of his estate was bequeathed to Waynesburg College, a private college in Pennsylvania. Fearful that the College would scrutinize Keystone's finances if it took control of McConnell's stock, two high ranking employees, Terry Church and Billy Cherry, forged a codicil to McConnell's will that devised McConnell's stock to Cherry and Church instead of to Waynesburg College. In addition, the codicil created small gifts of $20,000 for certain Keystone employees, including Vorono. Cherry also added her name to all of McConnell's bank accounts, creating joint ownership with survivorship in those accounts, and then transferring the funds from those accounts into her own separate accounts.

Despite the concealment efforts of Cherry and Church (which included burying boxes of bank records on Cherry's farm), the OCC finally caught up with Keystone in 1999. In 1998, Keystone, pursuant to an agreement with the OCC, hired an outside accounting firm, Grant Thornton, LLP, to review Keystone's books. Gariety I, 368 F.3d at 359. In May 1999, Grant Thornton issued a report declaring the bank to be on solid footing. Id. The OCC kept up its investigatory vigor, however, and in August 1999, the OCC verified that Keystone could not substantiate almost $515 million in loan assets, nearly one-half of its total assets. Id. at 360. On September 1, 1999, the OCC declared Keystone insolvent and

7

closed the bank.  Id.  The Federal Deposit Insurance Company ("FDIC") has since indicated that Keystone's failure cost the FDIC between $750 million and $850 million.  Id.

Summarizing Keystone's actual performance during the 1990s, we noted:

> A subsequent investigation by the Office of Inspector General determined that Keystone had been suffering heavy losses early in its growth period and that by late 1996 Keystone had become insolvent.  Keystone concealed its financial condition by continuing to record loans as assets even after they had been sold to investors as part of a securitized loan pool.  The Office of Inspector General concluded that "[a]lleged fraudulent accounting practices, uncooperative bank management and reported high profitability may have all served to mask the bank's true financial condition from OCC examiners."

Gariety I, 368 F.3d at 360 (alteration in original).

The four defendants before us obtained Keystone stock as part of the Employee Stock Ownership Plan ("ESOP").  The ESOP was terminated in 1995.  As noted above, the FDIC viewed Keystone as insolvent by 1996, and deposition testimony established that the stock shares at issue in this case, i.e., those sold between September 28, 1998 and September 1, 1999, were worthless at the time of the sales.  According to the Plaintiffs, Vorono, Headrick, Herron, and Wimmer sold the following amounts of stock during that time period:

| NAME | SHARES SOLD | GROSS PROCEEDS |
|------|-------------|----------------|
| Nancy Vorono | 11,286 | $2,321,830 |

8

| | | |
|---|---|---|
| Vida Headrick | 3,885 | $649,525 |
| Evelyn Herron | 1,000 | $172,500 |
| Jeanie Wimmer | 1,000 | $172,500 |

II.

We review de novo the district court's grant of summary judgment in favor of the four women, applying the same standard as the district court.  See Laber v. Harvey, 438 F.3d 404, 415 (4th Cir. 2006) (en banc).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). We must construe the facts in the light most favorable to the Plaintiffs, and we may not make credibility determinations or weigh the evidence.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Edell & Assoc., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 435 (4th Cir. 2001).  But there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted).

9

A.

The only claim before this court is Count One in Gariety II, which alleged a cause of action for unjust enrichment against Vorono, Headrick, Herron, and Wimmer. Under West Virginia law, which the parties agree governs these claims, an individual is unjustly enriched "whenever the legal title to property . . . has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest." Annon v. Lucas, 185 S.E.2d 343, 352 (W. Va. 1971) (internal quotation marks omitted); see also Patterson v. Patterson, 277 S.E.2d 709, 715 (W. Va. 1981) (noting that unjust enrichment occurs when property is "acquired through fraud, duress, undue influence or mistake, or through a breach of fiduciary duty, or through the wrongful disposition of another's property").

To remedy unjust enrichment, courts in equity may create a constructive trust over the property in question. "A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." Patterson, 277 S.E.2d at 715 (internal quotation marks omitted); see also St. Clair v. St. Clair, 273 S.E.2d 352, 355 (W.

10

Va. 1980) ("To invoke . . . unjust enrichment to impose a constructive trust upon property of another, it is necessary that it be shown that one party has been unjustly enriched."). Indeed, constructive trusts are "substantially an appropriate remedy against unjust enrichment." Annon, 185 S.E.2d at 352. It is important to remember that "[a] constructive trust arises not from agreement of parties, express or implied, but from the construction and operation of equity in order to satisfy the demands of justice." Id. at 353 (internal quotation marks omitted).

On appeal, the Plaintiffs argue that the district court erred in granting summary judgment because the evidence, viewed in the light most favorable to them, would permit a fact-finder to conclude that the four women were unjustly enriched because when they sold their stock between September 28, 1998 and September 1, 1999, they knew that the stock was worthless based upon inside information about Keystone's financial situation.

A careful review of the record compels the conclusion that the district court correctly granted summary judgment in favor of Vorono, Headrick, Herron, and Wimmer. Under West Virginia law, the Plaintiffs must show some form of wrongdoing--fraud, concealment, or some other similar wrongful act--on the part of the four women. Even drawing inferences in the Plaintiffs' favor, as we must, no such credible evidence exists to survive summary judgment. For instance, both Wimmer and Herron sold their stock only after being

11

approached by an unrelated broker and only sold a small amount relative to their holdings.[2] Headrick testified during her deposition that she sold her stock at her husband's urging and that she believed Keystone was doing very well. No contrary evidence exists in the record. In addition, while Vorono sold virtually all of her stock, she initially only offered to sell 1,000 of her more than 11,000 shares and was asked by the broker to sell the remainder. She was not, as the Plaintiffs contend, "dumping" her stock in April 1999. Moreover, Vorono retained more than $314,000.00 on deposit at Keystone at the time of the bank's failure.

At bottom, the Plaintiffs' sole evidence in this case consists of the timing of the stock sales by the four women. Such evidence amounts solely to speculation of wrongdoing, and "as in all summary judgments . . . the non-moving party must still provide evidence sufficient to create an issue for trial." Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006). Thus, "[m]ere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." Id. Accordingly, the district court did not err in granting summary judgment in favor of

---

[2]At the time Keystone closed its doors, Wimmer held approximately 2,900 shares of Keystone stock and Herron held approximately 3,500 shares. In addition, both women kept the proceeds from the stock they did sell in their personal accounts at Keystone.

12

Vorono, Headrick, Herron, and Wimmer on the Plaintiffs' unjust enrichment claim.

B.

Perhaps anticipating our decision on the unjust enrichment claim, the Plaintiffs also argue that, in the alternative, we should certify to the West Virginia Supreme Court of Appeals the question of whether West Virginia law recognizes what the Plaintiffs refer to as the "innocent beneficiary doctrine." See e.g., Pope v. Garrett, 211 S.W.2d 559, 562 (Tex. 1948) (finding that a "[constructive] trust should be impressed even though the wrongful conduct because of which the title was acquired is that of a third person" pursuant to the "policy against unjust enrichment" because "[b]ut for the wrongful acts the innocent defendants would not have inherited interests in the property"); Connecticut Gen. Life Ins. Co. v. Merkel, 279 N.W.2d 715, 716-17 (Wis. Ct. App. 1979) (noting that a constructive trust is imposed against innocent beneficiaries when there is a "finding of improper or wrongful conduct on the part of someone").[3] According to the Plaintiffs, the innocent beneficiary doctrine permits the Plaintiffs to recover

---

[3]The Restatement (First) of Restitution § 184 gives the following example:

> A, on his deathbed, attempts to execute a will leaving all his property to B. C by force or by fraud prevents A from executing the will. A dies intestate. A's heirs and next of kin hold upon a constructive trust for B.

13

proceeds from innocent beneficiaries of a third party's fraud or other wrongdoing. Thus, Plaintiffs contend that even if Vorono, Headrick, Herron, and Wimmer committed no wrongdoing, a constructive trust should still be imposed against them because the women were able to sell their stock for value due to the wrongdoing of others at Keystone.

Pursuant to W. Va. Code Ann. § 51-1A-3, "[t]he supreme court of appeals of West Virginia may answer a question of law certified to it by any court of the United States . . . if the answer may be determinative of an issue in a pending cause in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." W. Va. Code Ann. § 51-1A-3 (Lexis Nexis 2000). The Supreme Court of Appeals has expounded upon its authority to hear certified questions, noting that "certification requires 'a sufficiently precise and undisputed factual record on which the legal issues can be determined.'" Zelenka v. City of Weirton, 539 S.E.2d 750, 752 (W. Va. 2000) (quoting Bass v. Coltelli, 453 S.E.2d 350, 356 (W. Va. 1994)). In addition, that court "will not consider certified questions not necessary to the decision of a case." Zelenka, 539 S.E.2d at 752. Indeed, § 51-1A-3 "does not impose an absolute duty on [the Supreme Court of Appeals] to answer [certified] questions." Abrams v. W. Va. Racing Comm'n, 263 S.E.2d 103, 105 (W. Va. 1980). The court does "recognize that one of the beneficial purposes of

14

the certification statute is to provide foreign courts with the benefit of [the Supreme Court of Appeals of West Virginia's] determination of West Virginia law," and that its purpose is "to resolve ambiguities or unanswered questions" in West Virginia law. Id. at 106 (internal quotation marks omitted).

Certification is, by its very nature, discretionary on the part of the federal court as well. See Lehman Bros. v. Schein, 416 U.S. 386, 391 ("[Certification's] use in a given case rests in the sound discretion of the federal court."); Powell v. U.S. Fidelity & Guar. Co., 88 F.3d 271, 274 (4th Cir. 1996). Taking into consideration the purposes underlying West Virginia's certification statute, and utilizing our own discretion, we believe certification is inappropriate in this case.

West Virginia's law of equity has consistently required some form of wrongdoing when imposing constructive trusts. The equitable wrong of unjust enrichment has existed since West Virginia's statehood, see, e.g., Thompson v. Merchants' & Mechanics' Bank of Wheeling, 3 W. Va. 651 (W. Va. 1869), and has never extended as far as the Plaintiffs would have it do in this case. In reviewing state law, a federal court "should not create or expand [a] State's public policy." St. Paul Fire & Marine Ins. Co. v. Jacobson, 48 F.3d 778, 783 (4th Cir. 1995). Following that principle, we use our discretion and decline to certify a question of law to the West Virginia Supreme Court of Appeals.

15

III.

The failure of Keystone was undoubtedly tragic, and we are certainly sympathetic to the plight of the Plaintiffs, many of whom put significant portions of their life-savings into Keystone stock. The real "wrongdoers," Terry Church, Billy Cherry, and other Keystone executives, are, according to the Plaintiffs, essentially judgment proof, leaving the Plaintiffs to attempt to recover from persons skirted about the periphery of the Keystone affair. In this case, the Plaintiffs failed to bring forth sufficient evidence to permit a fact-finder to conclude that the four women were unjustly enriched and, accordingly, the judgment of the district court must be

AFFIRMED.